[No. C016836. Third Dist. Sept. 28, 1995.]

EMILY JANE HRIMNAK, a Minor, etc., Plaintiff and Respondent, v. JACK G. WATKINS, Defendant and Appelant.

**[Opinion certified for partial publication.\*]**

*The Reporter of Decisions is directed to publish this opinion except for parts 2 and 3 of the Discussion.

## Counsel

Charles Bond, Stefanie Gandolfi, Diehl, Steinheimer, Riggio, Haydel & Mordaunt, Michael R. Mordaunt and William D. Johnson for Defendant and Appellant.

Horvitz & Levy, David M. Axelrad, S. Thomas Todd and Ellis J. Horvitz as Amici Curiae on behalf of Defendant and Appellant.

Wilcoxen, Callahan, Montgomery & Harbison and Joseph F. Harbison III for Plaintiff and Respondent.

## Opinion

DAVIS, Acting P. J.—This medical malpractice case involves the application of Code of Civil Procedure section 667.7 (all further references to undesignated sections are to the Code of Civil Procedure). Section 667.7 was enacted as part of the Medical Injury Compensation Reform Act of 1975 (MICRA). The section allows a medical malpractice judgment awarding "future damages" of at least $50,000 to be paid on a periodic basis.

We conclude: (a) the trial court abused its discretion in fashioning a periodic-payment judgment (the trial court's basic error was failing to correlate the evidence of plaintiff's future losses with the payment of future damages); (b) a new jury trial to determine the gross amount of future economic damages is constitutionally required unless both parties agree to waive this right; and (c) the jury's present value determination of future economic damages can be used in calculating the plaintiff's attorney fees and the section 998-based prejudgment interest penalty. We decline the invitation to *require* that a satisfaction of judgment be entered if the periodic-payment portion of the judgment is funded by an annuity. The parties are certainly free to agree to such a satisfaction procedure, but to mandate such a procedure is a matter more appropriately left to the Legislature.

In an unpublished part of this opinion, we conclude there was no instructional error and we reduce a few of the costs awarded to the plaintiff.

We therefore affirm in part, reverse in part, and remand for further proceedings consistent with this opinion. Pertinent facts will be set forth in our discussion of the issues.

## DISCUSSION

### 1. *The Application of Section 667.7*

This medical malpractice case involved allegations that defendant (Dr. Watkins) failed to timely diagnose and properly treat the then 10-month-old plaintiff (Emily) for meningitis in May 1989, which resulted in Emily losing her hearing.

In a special verdict, the jury awarded Emily the following damages:

Past pain and suffering: $72,000
Future pain and suffering: $500,000
Past medical costs: $42,000
Future economic needs (present value): $584,629
Future lost earnings (present value): $439,500[2]

Pursuant to Civil Code section 3333.2 (another MICRA provision), the trial court reduced the pain and suffering damages from $572,000 to the statutory cap of $250,000 for noneconomic damages. The trial court then entered judgment in favor of Emily for $1,316,129 plus costs and section 998-based prejudgment interest (if any).

The trial court also granted Dr. Watkins's motion to schedule periodic payments of the judgment pursuant to section 667.7. The court ordered that Emily's past medical expenses of $42,000 and an additional sum of $50,000 be paid upon entry of judgment; that Emily's attorney fees be calculated following a determination of costs and prejudgment interest and that such fees, costs and interest be paid forthwith; and that the "remaining balance of all sums due and payable by reason of this judgment . . . shall be payable over a period of fifteen (15) years, payments to be made annually on or before the 15th day of January of each year commencing January 15, 1994 and shall be paid in equal annual installments including interest at the legal

---

[2]To maintain a consistent terminology in this case, we will use the terms "future economic needs," "future lost earnings," "future economic damages," and "future damages." "Future economic needs" covers future needs like hearing aids, speech therapy and communication equipment. "Future lost earnings" is self-explanatory. "Future economic damages" comprises both "future economic needs" and "future lost earnings." "Future damages," as set forth in section 667.7, *subdivision* (e)(l), covers all future losses, economic and noneconomic.

rate [10 percent] until the 15th year in which all remaining sums . . . shall be paid in full . . . . [¶] Upon payment of all sums due under this judgment, [Dr. Watkins] shall be entitled to a satisfaction of judgment."

On appeal, Dr. Watkins contends the trial court erred by failing to specify the amount of the periodic payments; by periodizing the present value of future economic damages rather than their gross amount; by awarding interest at the legal rate on these periodized, future economic damages; by periodizing for a term of 15 years without considering the evidence of when Emily would incur certain losses; and by failing to approve annuity funding of the periodic payments and a satisfaction of judgment based thereon.

Before we address these specific issues, we need to discuss briefly the background and purpose of section 667.7 and consider some related preliminary matters.

■ Section 667.7 was enacted in 1975 as part of MICRA. (Stats. 1975, 2d Ex. Sess. 1975-1976, chs. 1, 2, pp. 3949-4007.) The section, quoted in full in the footnote below, provides generally that when a plaintiff in a medical malpractice action is awarded "future damages" of $50,000 or more, the trial court, upon the timely request of either party, shall enter a judgment providing for the periodic payment of those damages.[3] (*American Bank & Trust Co.* v. *Community Hospital* (1984) 36 Cal.3d 359, 366-367 [204

---

[3]Section 667.7 provides: "(a) In any action for injury or damages against a provider of health care services, a superior court shall, at the request of either party, enter a judgment ordering that money damages or its equivalent for future damages of the judgment creditor be paid in whole or in part by periodic payments rather than by a lump-sum payment if the award equals or exceeds fifty thousand dollars ($50,000) in future damages. In entering a judgment ordering the payment of future damages by periodic payments, the court shall make a specific finding as to the dollar amount of periodic payments which will compensate the judgment creditor for such future damages. As a condition to authorizing periodic payments of future damages, the court shall require the judgment debtor who is not adequately insured to post security adequate to assure full payment of such damages awarded by the judgment. Upon termination of periodic payments of future damages, the court shall order the return of this security, or so much as remains, to the judgment debtor.

"(b)(1) The judgment ordering the payment of future damages by periodic payments shall specify the recipient or recipients of the payments, the dollar amount of the payments, the interval between payments, and the number of payments or the period of time over which payments shall be made. Such payments shall only be subject to modification in the event of the death of the judgment creditor.

"(2) In the event that the court finds that the judgment debtor has exhibited a continuing pattern of failing to make the payments, as specified in paragraph (1), the court shall find the judgment debtor in contempt of court and, in addition to the required periodic payments, shall order the judgment debtor to pay the judgment creditor all damages caused by the failure to make such periodic payments, including court costs and attorney's fees.

"(c) However, money damages awarded for loss of future earnings shall not be reduced or payments terminated by reason of the death of the judgment creditor, but shall be paid to

Cal.Rptr. 671, 683 P.2d 670, 41 A.L.R.4th 233] (*American Bank*); *Craven* v. *Crout* (1985) 163 Cal.App.3d 779, 781 [209 Cal.Rptr. 649] (*Craven*).)

Dr. Watkins timely requested that section 667.7 be applied here. He first raised the section in his answer, raised it again during pretrial hearings, and raised it again immediately after the jury returned its verdict. (See *Gorman* v. *Leftwich* (1990) 218 Cal.App.3d 141, 152 [266 Cal.Rptr. 671] (*Gorman*) [defendant raised section 667.7 in her answer as an affirmative defense, which "was certainly timely in the sense that it provided plaintiff's counsel with more than ample time in which to plan evidence on the issue of damages accordingly"]; *Craven, supra*, 163 Cal.App.3d at p. 784.) If timely requested, section 667.7 "impose[s] a mandatory duty on the trial court to

persons to whom the judgment creditor owed a duty of support, as provided by law, immediately prior to his death. In such cases the court which rendered the original judgment, may, upon petition of any party in interest, modify the judgment to award and apportion the unpaid future damages in accordance with this subdivision.

"(d) Following the occurrence or expiration of all obligations specified in the periodic payment judgment, any obligation of the judgment debtor to make further payments shall cease and any security given, pursuant to subdivision (a) shall revert to the judgment debtor.

"(e) As used in this section:

"(1)   'Future damages' includes damages for future medical treatment, care or custody, loss of future earnings, loss of bodily function, or future pain and suffering of the judgment creditor.

"(2)   'Periodic payments' means the payment of money or delivery of other property to the judgment creditor at regular intervals.

"(3)   'Health care provider' means any person licensed or certified pursuant to Division 2 (commencing with Section 500) of the Business and Professions Code, or licensed pursuant to the Osteopathic Initiative Act, or the Chiropractic Initiative Act, or licensed pursuant to Chapter 2.5 (commencing with Section 1440) of Division 2 of the Health and Safety Code; and any clinic, health dispensary, or health facility, licensed pursuant to Division 2 (commencing with Section 1200) of the Health and Safety Code. "Health care provider" includes the legal representatives of a health care provider.

"(4)   'Professional negligence' means a negligent act or omission to act by a health care provider in the rendering of professional services, which act or omission is the proximate cause of a personal injury or wrongful death, provided that such services are within the scope of services for which the provider is licensed and which are not within any restriction imposed by the licensing agency or licensed hospital.

"(f) It is the intent of the Legislature in enacting this section to authorize the entry of judgments in malpractice actions against health care providers which provide for the payment of future damages through periodic payments rather than lump-sum payments. By authorizing periodic payment judgments, it is the further intent of the Legislature that the courts will utilize such judgments to provide compensation sufficient to meet the needs of an injured plaintiff and those persons who are dependent on the plaintiff for whatever period is necessary while eliminating the potential windfall from a lump-sum recovery which was intended to provide for the care of an injured plaintiff over an extended period who then dies shortly after the judgment is paid, leaving the balance of the judgment award to persons and purposes for which it was not intended. It is also the intent of the Legislature that all elements of the periodic payment program be specified with certainty in the judgment ordering such payments and that the judgment not be subject to modification at some future time which might alter the specifications of the original judgment."

enter a periodic payment judgment in cases falling within the four corners of the section." (*Fein* v. *Permanente Medical Group* (1985) 38 Cal.3d 137, 155 [211 Cal.Rptr. 368, 695 P.2d 665]; but see *Hurlbut* v. *Sonora Community Hospital* (1989) 207 Cal.App.3d 388, 405-406 [254 Cal.Rptr. 840].)

The Legislature expressed its intent regarding section 667.7 in subdivision (f) of the section. (Subdivision (f) is quoted in footnote 3, *ante*.) Essentially, the Legislature expressed its intent "to provide compensation sufficient to meet the needs of an injured plaintiff and those [dependent on the plaintiff] for whatever period is necessary while eliminating the potential windfall from a lump-sum recovery . . . ." The California Supreme Court recently described the role of section 667.7 in the context of MICRA as a whole, by stating: "The continuing availability of adequate medical care depends directly on the availability of adequate insurance coverage, which in turn operates as a function of costs associated with medical malpractice litigation. . . . Accordingly, MICRA includes a variety of provisions all of which are calculated to reduce the cost of insurance by limiting the amount and timing of recovery in cases of professional negligence. (See[, e.g.,] . . . Code Civ. Proc., § 667.7 [authorizing periodic payments for future damages in excess of $50,000, with termination of benefits in the event of death] . . . .)" (*Western Steamship Lines, Inc.* v. *San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 111-112 [32 Cal.Rptr.2d 263, 876 P.2d 1062].)

"Consistent with legislative intent, the jury's role [under section 667.7] is to designate the amount of future damages subject to periodic payment while the court's role is to fashion the details of a periodic payment schedule." (*Atkins* v. *Strayhorn* (1990) 223 Cal.App.3d 1380, 1397 [273 Cal.Rptr. 231] (*Atkins*); see *American Bank, supra*, 36 Cal.3d at pp. 376-377.) The burden remains on the plaintiff to present evidence of damages even if it is the defendant who has requested that section 667.7 be applied. (See *Schiernbeck* v. *Haight* (1992 7 Cal.App.4th 869, 878, 882 [9 Cal.Rptr.2d 716] (*Schiernbeck*); *Gorman, supra*, 218 Cal.App.3d at p. 152.)

With this background and purpose in mind, we turn to the specific issues in this case.

### a.  *The Trial Court's Periodization*

■  Dr. Watkins first contends the trial court erred by failing to specify the amount of the periodic payments. We agree.

As section 667.7, subdivision (b)(1), states, "[t]he judgment ordering the payment of future damages by periodic payments shall *specify* the recipient

or recipients of the payments, *the dollar amount of the payments*, the interval between payments, and the number of payments or the period of time over which payments shall be made." (See *American Bank, supra,* 36 Cal.3d at pp. 374-375.) The trial court's judgment fails to specify the dollar amount of each periodic payment.

Next, Dr. Watkins asserts the trial court erred by periodizing the present value of future economic damages rather than their gross amount. Again, we agree.

When a party properly invokes section 667.7, ". . . the [trial] court must fashion the periodic payments based on the *gross* amount of future damages." (*Schiernbeck, supra,* 7 Cal.App.4th at p. 878, original italics; see *Gorman, supra,* 218 Cal.App.3d at p. 153.) This is because if a present value award is periodized, a plaintiff might not be fully compensated for his or her future losses; the judgment, in effect, would be discounted twice: first by reducing the gross amount to present value and second by deferring payment. (See Flahavan et al., Cal. Practice Guide: Personal Injury (The Rutter Group 1994) ¶ 3:104, pp. 3-55 to 3-56.)[4]

In a related contention, Dr. Watkins asserts the trial court erred by awarding interest at the legal rate on the future economic damages (which, as noted, had been reduced to present value and periodized). Through this award of interest, the trial court tried to counteract the "double discount" factor noted above. (See *Schiernbeck, supra,* 7 Cal.App.4th at p. 874.) The proper approach, however, is for the jury to determine the gross amount of future damages and for the court to structure a periodic payment schedule based on that amount. (*Id.* at pp. 874, 878.) This approach more accurately reflects future damages, is more in tune with the respective roles for the jury and the court in implementing section 667.7, and does not implicate the problem of interest being awarded on periodic payments that are not yet due. (*Ibid.*; see also *Gorman, supra,* 218 Cal.App.3d at pp. 148-150, 153.)[5]

---

[4]Emily's counsel is concerned that presenting evidence of gross damages will lead to "astronomical" figures placed before the jury. If "astronomical" figures arise, counsel can emphasize the scope and duration of the damages being compensated, as well as the effects of inflationary progression over long periods. Moreover, counsel can have the jury determine the gross amount of future damages *and* the present value of those damages. (See *Gorman, supra,* 218 Cal.App.3d at pp. 148-150; see BAJI No. 16.01 [Form of Special Verdict—Medical Malpractice].)

[5]*Schiernbeck* suggests that a court may have the authority to award interest on the unpaid balance of a periodic payment judgment for future *noneconomic* damages (statutorily capped at $250,000 by Civ. Code, § 3333.2). (7 Cal.4th at pp. 879-882; see also § 667.7, subd. (e)(1) [" 'Future damages' " under section 667.7, subd. (a) includes damages for future pain and suffering].) Interest on noneconomic damages poses no issue in this case as Dr. Watkins has

■ Dr. Watkins next claims the trial court erred by structuring periodic payments over 15 years without considering the evidence of when Emily would incur certain losses. Again, Dr. Watkins's challenge has hit its mark.

■ In structuring a periodic-payment schedule under section 667.7, a trial court is "guided by the evidence of future damages" introduced at trial. (*American Bank, supra,* 36 Cal.3d at p. 377; see *Atkins, supra,* 223 Cal.App.3d at p. 1397; see also § 667.7, subds. (a), (f).) The fundamental goal in this respect is to attempt to match losses with compensation "to ensure that money paid to an injured plaintiff will in fact be available when the plaintiff incurs the anticipated expenses or losses in the future." (*American Bank, supra,* at p. 369; see *Atkins, supra,* at p. 1398.) The target is "a fair correlation between the sustaining of losses and the payment of damages." (*American Bank, supra,* at p. 376.) The standard of review on this issue is whether the trial court abused its discretion in structuring a periodic payment schedule. (*Atkins, supra,* at p. 1398.) ■ We conclude the trial court abused its discretion in fashioning the periodic-payment schedule here.

The trial court's clearest abuse occurred when it periodized Emily's damages for future lost earnings. Emily presented undisputed testimony from her economist (Dr. Moss) that the present value of her future lost earnings was $569,074 if she graduated from high school; $645,342 if she completed one to three years of college; and $804,008 if she graduated from college. Although Dr. Watkins did not challenge these amounts, he did challenge Emily's assumption in determining them that she would be unemployable. The jury apparently agreed with Dr. Watkins's challenge, and awarded Emily future lost earnings in the present value amount of $439,500.

The trial court simply ordered Dr. Watkins to pay Emily's future lost earnings in annual, equal installments (with interest) for a period of 15 years, beginning at the start of 1994. The problem, however, is that Emily was four years old at the time of trial in 1993; she would just be starting her working life when her periodic payments for future lost earnings would end. This schedule does not represent a fair correlation between "the sustaining of losses and the payment of damages." (*American Bank, supra,* 36 Cal.3d at p. 376.)

The trial court also did not fairly correlate the evidence of Emily's future economic needs with their periodic payment. Emily presented undisputed testimony from her economist (Dr. Moss) that the present value of her future economic needs (based on life expectancy to age 79) was as follows:

not requested that the noneconomic damages be periodized; he wants to pay all noneconomic damages in a lump-sum amount upon entry of judgment.

| | | |
|---|---|---:|
| (1) | hearing aids (a) to age 10: | $13,500 |
| | (b) ages 11-79: | $36,506 |
| (2) | interpretive signing, to age 79: | $615,568 |
| (3) | speech therapy, to age 18: | $188,227 |
| (4) | family counseling, to age 18: | $14,743 |
| (5) | home modifications, now: | $2,000 |
| (6) | communication equipment, to age 79: | $6,480 |
| (7) | miscellaneous equipment, to age 79: | $15,389 |
| | Total: | $892,413 |

The jury awarded Emily the present value sum of $584,629 for future economic needs. This figure is $307,784 less than $892,413; and $307,784 is one-half of $615,568, the amount Emily requested for four hours of interpretive signing per week for her lifetime. Consequently, the jury reduced Emily's future economic needs for interpretive signing from four hours a week to two hours a week, a fact Emily conceded in her motion for additur.

The trial court's 15-year periodic-payment schedule does not fairly correlate these future economic needs with the evidence of when they will arise. As we have seen, a precise match between future losses and compensation is not required. Nevertheless, to uphold the trial court's periodic-payment schedule on appeal, there must be evidence to support it. (*Atkins, supra,* 223 Cal.App.3d at pp. 1397-1398; see *American Bank, supra,* 36 Cal.3d at pp. 369, 376-377; § 667.7, subd. (f).) Here, as with Emily's future lost earnings, the trial court simply ordered Dr. Watkins to pay Emily's future economic needs in annual, equal installments over the next 15 years, with interest. This is an arbitrary determination rather than an evidentiary one. Accordingly, the trial court abused its discretion in this regard as well.

b. *The Jury Trial Right on Determining the Gross Amount of Future Economic Damages*

■ Since we are remanding this matter to the trial court for it to fashion a new periodic-payment judgment, and since the jury determined only the present value of Emily's future economic needs and future lost earnings, the issue arises as to whether a new jury trial is required to determine the gross amount of these future economic damages. This issue is centered on California's constitutional right to jury trial, which encompasses here the jury's role in determining the amount of damages. (Cal. Const., art. I, § 16; see *American Bank, supra,* 36 Cal.3d at pp. 374-377; *Gorman, supra,* 218 Cal.App.3d at pp. 150, 153; *Atkins, supra,* 223 Cal.App.3d at p. 1397.)

In *American Bank,* the California Supreme Court considered whether section 667.7 violates the California constitutional right to jury trial. (36

Cal.3d at p. 374.) No violation occurs, said the court, so long as the jury designates the portion of its verdict that compensates the plaintiff for future damages. (*Id.*, at p. 376.) "Once the jury has designated the amount of future damages—and has thus identified the amount of damages subject to periodic payment—we believe that the court's authority under section 667.7, subdivision (b)(1), to fashion the details of a periodic payment schedule does not infringe the constitutional right to jury trial." (*Ibid.*) The *American Bank* court quoted language from *Jehl* v. *Southern Pac. Co.* (1967) 66 Cal.2d 821, 829 [59 Cal.Rptr. 276, 427 P.2d 988], which upheld the nonjury constitutionality of the additur procedure, stating " 'new procedures better suited to the efficient administration of justice may be substituted *if there is no impairment of the substantial features of a jury trial.*' " (36 Cal.3d at pp. 375-376, italics in *American Bank*.) In closing, the *American Bank* court noted that the additur procedure affords a court considerably greater latitude in fixing the plaintiff's ultimate damage recovery than the section 667.7 process as construed in *American Bank*. (36 Cal.3d at p. 377.)

A few years after *American Bank* came the decision in *Gorman*, where the court faced the jury right issue in a posture similar to this case. The trial court in *Gorman*, pursuant to a special verdict form, directed the jury to determine only the present value of future damages, although detailed testimony of the gross amount of future damages had been presented at trial as well.[6] (218 Cal.App.3d at pp. 150, 152.) The appellate court in *Gorman* concluded that the trial court had abused its discretion in refusing the defendant's special verdict form (which asked the jury to determine the present value and the gross amount of future damages—like BAJI No. 16.01) and in restricting the jury's determination of future damages to present value. But, said *Gorman*, the trial court could rectify this error without a new jury trial on damages.

Citing *American Bank,* the *Gorman* court concluded that ". . . where the jury returns only a present value verdict, a trial court can consider the trial testimony and, if necessary, supplement that evidence with postverdict testimony in order to determine the gross damages and in turn to fashion a schedule of periodic payments based thereon. We find nothing in such a procedure which denies either party its constitutional right to jury trial so long as the resulting judgment falls within the parameters of the verdict and the integrity of the fact finder's determination is maintained." (218 Cal.App.3d at p. 150.) *Gorman* reasoned that since the "jury did make a finding as to the amount of future damages," the jury fulfilled its constitutional and statutory responsibilities as construed in *American Bank. (Id.*, at p. 153.)

---

[6]The parties here did not focus on gross amounts at trial. But in various proceedings before and after trial, gross amount determinations were submitted.

We are troubled by *Gorman*'s view that a trial court can determine the gross amount of future economic damages based on the jury's determination of present value without impinging the constitutional right to jury trial, especially in light of the widely varying gross amounts submitted here. Emily's economist (Dr. Moss) submitted *two* widely varying figures for the gross amount of future lost earnings based on the *same* present value figures for those losses.[7] And Dr. Watkins's economist (Dr. Udinsky), using Dr. Moss's figures and apparently her methodology, calculated a gross amount for future economic needs that is about 5 percent lower than what Dr. Moss determined. Furthermore, the future lost earnings damages do not begin for many years since Emily is just a young child, and her future economic needs present an array of certain needs at certain times.

If the conversion from present value to gross amount traveled a generally agreed mechanical path, we would have no problem with the *Gorman* approach of judicial determination. But it appears that converting from present value to gross amount can involve several judgment calls and determinations of fact. *Gorman* itself recognizes this when it says that a trial court, in determining gross damages, can supplement the trial evidence on present value with postverdict testimony. (218 Cal.App.3d at p. 150.) Such judgment calls and determinations of fact should be made by the jury unless the parties agree to another procedure. Although a trial court retains considerable power over a plaintiff's award via the additur and remittitur doctrines, the adverse parties in those situations have a right to have the *jury* determine damages in a new trial. Consistent with legislative intent regarding section 667.7 and the constitutional right to jury trial, ". . . the jury's role is to designate the *amount* of future damages subject to periodic payment . . . ." (*Atkins, supra,* 223 Cal.App.3d at p. 1397, italics added; *American Bank, supra,* 36 Cal.3d at pp. 376-377.) And under section 667.7, "the court must fashion the periodic payments based on the *gross amount* of future damages." (*Schiernbeck, supra,* 7 Cal.App.4th at p. 878, first italicized word in

[7]For example, at her deposition (which was not admitted into evidence at trial but was a matter of discussion in the posttrial periodic-payment proceedings) Dr. Moss stated that if Emily graduated from high school the present value of her future lost earnings would be $569,074 (the same figure Dr. Moss testified to at trial) while the gross amount of these losses would be $1,482,707. At the posttrial periodic-payment proceedings, Dr. Moss put the gross figure (based on the same present value figure and assumption of high school graduation) at $2,512,414. Similar disparities are presented for higher educational levels.

Dr. Watkins has accepted the present value and gross amount figures for future lost earnings that Dr. Moss submitted at her deposition (e.g., for a high school education, the present value of $569,074 and the gross amount of $1,482,707 rather than the gross amount of $2,512,414, proportionally reduced based on the jury's present value verdict for future lost earnings of $439,500). Also, Dr. Watkins did not dispute Dr. Moss's present value figures for future economic needs (although the jury reduced the interpretive signing amount by one-half, from $615,568 to $307,784, resulting in a present value verdict for future economic needs of $584,629).

original, second italics added.) Because the conversion here from present value to gross amount involves determinations of fact, and because gross amount is *the* pivotal figure for periodic payments, we conclude the parties have a constitutional right to have the jury determine that gross amount.

    c.   *The Monetary Basis for Calculating Attorney Fees and Section 998 Prejudgment Interest*

    As amici curiae California Medical Association, California Dental Association, and California Association of Hospitals and Health Systems (amici curiae) note, it may be necessary to determine the present value of the periodic-payment portion of the judgment for use (1) in calculating the plaintiff's attorney's contingency fee (Bus. & Prof. Code, § 6146, subd. (b); see *Schneider* v. *Kaiser Foundation Hospitals* (1989) 215 Cal.App.3d 1311, 1318-1320 [264 Cal.Rptr. 227], disapproved on other grounds in *Moncharsh* v. *Heily & Blase* (1992) 3 Cal.4th 1, 27-28 [10 Cal.Rptr.2d 183, 832 P.2d 899]; see also *Atkins, supra,* 223 Cal.App.3d at pp. 1398-1399); (2) in determining whether a prejudgment interest penalty is owed under section 998 and Civil Code section 3291 because the amount of the judgment is greater than the amount of the rejected settlement offer (see *Atkins, supra*); or (3) in setting off a codefendant's settlement (see *Franck* v. *Polaris E-Z Go Div. of Textron, Inc.* (1984) 157 Cal.App.3d 1107, 1120-1121 [204 Cal.Rptr. 321]). Here, we are concerned with attorney fees and prejudgment interest. Amici curiae contend the present value of the periodic payments *must* be determined by the cost of the annuity purchased to fund the payments. We disagree.

    Although the cost of an annuity provides one measure of the present value of periodic payments, it is not the only measure. The jury determined present value here in the traditional manner (by determining the present sum of money reasonably invested that would pay the equivalent of future damages —see BAJI No. 14.70). This jury determination provides a proper basis for calculating Emily's attorney fees and prejudgment interest.

    *Schneider* concluded, in analogizing to the structured settlement context, that ". . . the value of an award of periodic payments [under section 667.7] for the purpose of calculating a contingent attorney's fee is the *present* value of the periodic payments, normally best represented by the cost of the annuity purchased to fund the payments." (215 Cal.App.3d at p. 1314.) The cost of annuity approach is simple (*id.,* at p. 1319); it is also considered the most accurate because if a plaintiff with a section 667.7 judgment dies, the periodic payments for that plaintiff's future economic needs end (periodic payments for future lost earnings continue if the plaintiff had a dependent at

the time of death). (§ 667.7, subds. (b)(1), (c).) The cost of the annuity takes into account these contingencies, and makes the attorney bear the risk of his or her client's premature death as well. (See *Schneider* v. *Kaiser Foundation Hospitals, supra,* 215 Cal.App.3d at pp. 1319-1320; see also *Johnson* v. *Sears, Roebuck & Co.* (1981) 291 Pa.Super. 625 [436 A.2d 675, 678].)

While the cost of an annuity to fund periodic payments may be a good way to measure the present value of those payments, it is not the only measure. The same court that decided *Schneider* recognized this fact in *Atkins.* The *Atkins* court concluded that a jury's determination of present value of periodic payments using the traditional method (like here, BAJI No. 14.70—present sum reasonably invested) could be used to calculate whether a prejudgment interest penalty on a section 667.7 judgment is warranted under section 998 and Civil Code section 3291. (223 Cal.App.3d at pp. 1398-1399.) *Atkins* said this conclusion "is consistent with the holding . . . in *Schneider* . . . ." (*Id.,* at p. 1399.)

Thus, the present value of Emily's future economic needs and future lost earnings will not have to be redetermined on remand. The jury has already determined those present values pursuant to an accepted method, and the parties have not challenged those determinations on appeal.

Amici curiae also contend that prejudgment interest under section 998 and Civil Code section 3291 cannot be awarded on the periodic portion of the judgment. Amici curiae argue that Civil Code section 3291 simply changes the starting date for legal interest on the judgment from the date of entry of judgment to the date of the section 998 settlement offer; it necessarily follows, argue amici curiae, that any portion of the judgment that by law is not subject to interest from the date of entry of judgment—such as a future periodic payment, which bears interest only if left unpaid after its future payment date (see *Schiernbeck, supra,* 7 Cal.App.4th at p. 874)—also should not be subject to interest from the date of the section 998 offer. Amici curiae mistakenly confuse interest on unpaid judgment amounts with the prejudgment interest penalty under section 998 and Civil Code section 3291.

Under section 998, either side to a lawsuit can serve a written settlement offer on the other. Under Civil Code section 3291, if a plaintiff makes a section 998 offer to a defendant which is not accepted "and the plaintiff obtains a more favorable judgment, the judgment shall bear interest at the legal rate of 10 percent per annum calculated from the date of the plaintiff's first offer pursuant to Section 998 . . . which is exceeded by the judgment, and interest shall accrue until the satisfaction of judgment." Section 998 and Civil Code section 3291 are designed to encourage settlements and penalize

those who refuse reasonable settlement offers. (*See Evers* v. *Cornelson* (1984) 163 Cal.App.3d 310, 317 [209 Cal.Rptr. 497]; *Bank of San Pedro* v. *Superior Court* (1992) 3 Cal.4th 797, 804 [12 Cal.Rptr.2d 696, 838 P.2d 218]; *Lakin* v. *Watkins Associated Industries* (1993) 6 Cal.4th 644, 663 [25 Cal.Rptr.2d 109, 863 P.2d 179]; *Hurlbut* v. *Sonora Community Hospital, supra*, 207 Cal.App.3d at p. 408.) Amici curiae's argument, besides mixing legal apples and oranges, would also undermine this purpose.

Amici curiae also note that Civil Code section 3291 does not authorize interest on the verdict but only on the judgment. The trial court recognized this fact as well. The trial court reduced the jury's verdict for noneconomic damages from $572,000 to the Civil Code section 3333.2 cap of $250,000, resulting in a judgment of $1,316,129. This judgment was more than Emily's section 998 offer of $1 million, and the award of a prejudgment interest penalty under section 998 and Civil Code section 3291 is proper based on the $1,316,129 judgment.

The trial court, however, did not calculate the amount of prejudgment interest. Emily's counsel did, arriving at a figure of $228,247.14; Dr. Watkins did not challenge this figure below or on appeal.

The trial court will have to calculate attorney fees based on the prejudgment interest of $228,247.14 and the judgment of $1,316,129. This calculation must accord with Business and Professions Code section 6146 (governing contingency fees in medical malpractice actions), and the amount of attorney fees must be approved pursuant to Probate Code section 3600 et seq. (approval of attorney fees for actions involving minor plaintiffs).

d. *Satisfaction of Judgment Through Annuity Funding*

Basically, Dr. Watkins and amici curiae ask us to set forth standards that will allow a section 667.7 judgment debtor to satisfy a periodic-payment judgment through the purchase of an annuity, even if the judgment creditor does not agree to this procedure. We decline to intervene in this way for two reasons.

First, this is a request more appropriately addressed to the Legislature. Section 667.7 makes no reference to annuity funding or to satisfaction of judgment. We should not specify standards in this area without the benefit of legislative guidance.

Second, on a more practical note peculiar to this case, it is premature to consider satisfaction of judgment before a valid judgment has been entered. The issue of satisfaction of judgment arises only when the judgment creditor

refuses to acknowledge satisfaction of judgment and the judgment debtor petitions the court to obtain a satisfaction. (See § 724.050, subd. (d); *George S. Nolte Consulting Civil Engineers, Inc.* v. *Magliocco* (1979) 93 Cal.App.3d 190, 193 [155 Cal.Rptr. 348].) Both the plaintiff and Dr. Watkins have proposed annuity funding of the judgment in this case. Undoubtedly a plaintiff and a defendant can stipulate to a judgment calling for the defendant to purchase an annuity to make the periodic payments. In that case, the purchase of the annuity would satisfy the judgment. On remand, Dr. Watkins and plaintiff may agree to such an annuity arrangement, and anything we would have to say about the purchase of an annuity *mandating* the satisfaction of a judgment would be irrelevant.

The issue here is similar to one presented in *Roesch* v. *Ryan* (E.D.Mo. 1993) 841 F.Supp. 288. *Roesch* involved the application of Missouri's periodic-payment judgment statute, which is similar to section 667.7. (841 F.Supp. at p. 290.) Like Dr. Watkins and amici curiae here, the defendants in *Roesch* argued they should be able to satisfy the judgment by simply purchasing an annuity. The court in *Roesch* disagreed, stating: "If plaintiff wishes to accept an annuity as satisfaction of the judgment she may do so, but the law does not require her to agree to that. Defendants' obligation is to pay the money, in the amounts and at the times that will be specified." (*Id.* at pp. 293-294.) The same can be said here; if the law is to impose such a requirement, that law should come from the Legislature and not from the courts.

2., 3.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

## DISPOSITION

The portion of the judgment awarding Emily $1,316,129 for past damages and the present value of future damages plus (unspecified) costs of suit and prejudgment interest is affirmed. The portion of the judgment directing an immediate payment of $92,000 to Emily upon entry of judgment is affirmed. In all other respects, the judgment is reversed and the matter is remanded to the trial court to conduct further proceedings consistent with this opinion. The trial court is directed to order the remaining lump-sum amount of $200,000 to be paid to Emily immediately upon entry of judgment. The trial court is directed to hold further proceedings to convert to gross amounts the jury's present value determinations for future economic needs ($584,629) and for future lost earnings ($439,500), and to fashion a periodic-payment

---

*See footnote, *ante*, page 964.

schedule based on those gross amounts in line with the trial evidence. The trial court is directed to award prejudgment interest under section 998 and Civil Code section 3291 in the undisputed amount of $228,247.14. The trial court is directed to ascertain the amount of attorney fees for Emily's counsel based on the present value judgment figure of $1,316,129 plus the prejudgment interest amount of $228,247.14; the amount and payment of these fees will be made pursuant to Business and Professions Code section 6146 and Probate Code section 3600 et seq. The trial court's order on Dr. Watkins's motion to tax costs is modified to reduce the costs awarded to Emily by the following amounts: $133 for Nurse Driscoll's testimony; $1,545.07 for transcript fees; and $566.18 for court reporter fees; as so modified, the trial court's order on Dr. Watkins's motion to tax costs is affirmed.

Any judgment payments made to Emily while she is a minor shall be paid to Emily through her proper legal representative (e.g., legal guardian) and shall be placed into an appropriate account subject to appropriate court order as determined by the trial court. Each party shall pay its own costs on appeal.

Nicholson, J., and Raye, J., concurred.

**DAVIS, Acting P. J.,** Concurring.—Predictably, I find the majority quite persuasive. Nevertheless, I feel compelled to write separately to address the issue of satisfaction of judgment through annuity funding. Concerns about judicial restraint and the procedural posture of this case make the deferential tone of the majority on this issue appropriate. In this concurrence, I am not under these shackles, and my aim is to raise awareness, I hope legislative awareness, about this issue and about a possible framework for considering it.

A natural tension exists between the health care provider and his or her insurer in the application of Code of Civil Procedure section 667.7. (All further references to undesignated sections are to the Code of Civil Procedure.) The health care provider wants the insurer to pay the judgment off —now. The insurer, on the other hand, wants to defer payment. In other words, while the health care provider seeks to put the judgment behind him or her as soon as possible, the insurer wants to put the judgment in front of it for as long as it can. The present case aptly illustrates this tension as Emily's future economic needs span a 75-year period.[1]

This tension threatens the vitality of section 667.7. But any remedy must account for the section's twin aims: to ensure payments to a medically

---

[1]The health care provider does benefit through lower insurance premiums resulting from deferred payment of judgments. But this benefit is generally not as immediate or as dramatic as the detriment of a loan being denied because a large, unsatisfied judgment appears on the health care provider's credit report.

One commentator has suggested that this tension may be overblown because, although a recorded section 667.7 periodic judgment creates a judgment lien on real property (§ 697.320,

injured plaintiff when needed while reducing the cost of medical malpractice insurance. (§ 667.7, subd. (f); *Western Steamship Lines, Inc.* v. *San Pedro Peninsula Hospital* (1994) 8 Cal.4th 100, 111-112 [32 Cal.Rptr.2d 263, 876 P.2d 1062] (*Western Steamship*).) The National Conference of Commissioners on Uniform State Laws has given thought to this dilemma. In their 1990 Uniform Periodic Payment of Judgments Act (Uniform Act), they have resolved it by allowing a periodic-payment judgment to be satisfied if all lump-sum amounts, including costs and interest, have been paid and if the periodic amounts are funded by a qualified annuity funding plan backed by a security arrangement. (14 West's U.Laws Ann. (1994 pocket pt.) Uniform Act, § 16; see also *id.*, §§ 10, 11, 18.)

Although California has not adopted the Uniform Act, the concept of annuity funding is well established in this state for structured settlements and has been mentioned in the context of periodic-payment judgments. (See *Schneider* v. *Kaiser Foundation Hospitals* (1989) 215 Cal.App.3d 1311, 1317-1320 [264 Cal.Rptr. 227]; *Franck* v. *Polaris E-Z Go Div. of Textron, Inc.* (1984) 157 Cal.App.3d 1107, 1119 [204 Cal.Rptr. 321]; *Atkins* v. *Strayhorn* (1990) 223 Cal.App.3d 1380, 1398-1399 [273 Cal.Rptr. 231].) Indeed, Emily's counsel proposed an annuity to fund the periodic-payment judgment here. For reasons discussed below, I think the annuity approach outlined in the Uniform Act, with slight modifications, is workable in a case like the present one and could result in a satisfaction of judgment being entered on a section 667.7 periodic-payment judgment.

The Uniform Act requires, for satisfaction purposes, that a periodic-payment judgment be funded by a court-approved "qualified funding plan," which means that a "qualified insurer" ultimately must be responsible for the obligation owed to the plaintiff. (Uniform Act, §§ 10(a), 11, 18(b).) Under the Uniform Act, a defendant's liability insurer can create a qualified annuity funding plan by purchasing an annuity contract(s) from a "qualified insurer" and having the judgment creditor take a perfected security interest in the annuity contract(s). (Uniform Act, § 11(a)(2).)

---

subd. (a)(2)), the lien is not effective for any payment installment until the payment is due under the terms of the judgment (§ 697.350, subd. (c)). (See Horvitz & Levy, MICRA Manual (1993) pp. 126-127, fn. 60.) This commentator also notes that section 724.220 allows a health care provider to prove to a prospective lender that all matured payments have been paid—by obtaining an acknowledgment of satisfaction of matured installments from the plaintiff. (Horwitz & Levy, MICRA Manual, *supra*, at p. 127.)

As noted above, however, the tension to which I refer is a natural and practical one based principally upon timing. The statutory sections on judgment liens and partial satisfactions quoted in Horvitz and Levy's work do little to counteract this timing concern, and their intricacies may be difficult to convey in simple terms to a loan officer whose eyes are glazing over.

The "qualified insurer" criteria set forth in the Uniform Act would work here (see Uniform Act, § 18(b)(2)-(b)(4)), but the annuity security arrangement set forth in the Uniform Act (i.e., the perfected security interest in the annuity contract) would not. The annuity security arrangement would not work because, as the comment to section 11 of the Uniform Act notes, "the annuity-contract option is not available [presently] because a security agreement would make the periodic payments taxable." (14 West's U.Laws Ann., *supra*, Uniform Act, § 11, com., p. 31.) Dr. Watkins has suggested another security arrangement that would work here: his malpractice insurer would buy an annuity or annuities from a "highly-rated" life insurer (i.e., a "qualified insurer" under the Uniform Act—see immediately below) "with the performance of the payment obligations guaranteed by an additional highly-rated [i.e.,'qualified'] insurer." For an insurer to be considered a "qualified insurer" under the Uniform Act, it must meet the following criteria (Uniform Act, § 18(b)(2)-(b)(4).):

(a) be an insurer admitted to write insurance in the state;

(b) have a minimum of $100 million of capital and surplus, exclusive of any mandatory security valuation reserve; and

(c) have one of the following ratings from two of the following rating organizations:

(i) A.M. Best Company: A+, A+g, A+p, A+r, or A+s;

(ii) Moody's Investors Service Claims Paying Rating: Aa3, Aa2, Aa1, or Aaa;

(iii) Standard & Poor's Corporation Insurer Claims-Paying Ability Rating: AA-, AA, AA+, or AAA;

(iv) Duff & Phelps Credit Rating Company Insurance Company Claims Paying Ability Rating: AA-, AA, AA+, or AAA.

Based on the authority discussed below, I think a satisfaction of judgment could be entered on a section 667.7 periodic-payment judgment like the one in this case if the following requirements were met: if an annuity or annuities were purchased from a "qualified insurer" (meeting the criteria just specified); if a security arrangement were in place (as suggested by Dr. Watkins); if both the annuity purchase and the security arrangement were approved by the trial court in a judgment; and if all the lump-sum judgment amounts had been paid (including costs and interest). (See Uniform Act, § 16.)

Under former section 675, a court could enter satisfaction of judgment whenever a judgment was "satisfied in fact." (Former § 675, subd. (a); *George S. Nolte Consulting Civil Engineers, Inc.* v. *Magliocco* (1979) 93 Cal.App.3d 190, 193 [155 Cal.Rptr. 348] (*Nolte*).) In *Nolte,* the plaintiff engineer won a $6,000 judgment that could be increased by an additional

$4,000 if the development plans he drafted for the defendant's property were ever used. After the defendant sold the property to a third party (and plaintiff's plans were not used by the third party in developing the property), the trial court entered satisfaction of judgment upon the $6,000 payment, finding that the contingent liability of plan use would not occur. The appellate court upheld the order directing entry of satisfaction of judgment, stating: "A judgment creditor may not refuse to acknowledge satisfaction of a judgment without just cause [citing former § 675]. In determining whether a judgment has been satisfied in fact under section 675, a court may take into account whether the judgment would otherwise remain unsatisfied indefinitely, impairing the debtor's credit, deterring others from trading with the debtor, or restraining the alienation of property subject to the judgment." (93 Cal.App.3d at p. 194.)

Section 724.010, subdivision (a), which is based upon former section 675, no longer contains section 675's "satisfied in fact" language.[2] Nevertheless, the legislative committee comment to section 724.010 states in part that "[s]ubdivision (a) of Section 724.010 is drawn from language that was contained in subdivision (a) of former Section 675 . . . . Subdivision (a) of Section 724.010 is not an exclusive statement of the methods for satisfying a money judgment. See, *e.g.,* . . . *George S. Nolte Consulting Civil Engineers, Inc.* v. *Magliocco,* 93 Cal.App.3d 190, 155 Cal.Rptr. 348 (1979) (entry of satisfaction ordered where trial court determined that $4,000 contingent liability could be disregarded since contingency would not occur) . . . ." (Legis. committee com., Deerings Ann. Code Civ. Proc. (1983 ed.) § 724.010, p. 68; see also *Pierson* v. *Honda* (1987) 194 Cal.App.3d 1411, 1414 [240 Cal.Rptr. 148]; *Schumacher* v. *Ayerve* (1992) 9 Cal.App.4th 1860, 1863 [12 Cal.Rptr.2d 417].)

Together, the qualified annuity funding plan and security arrangement discussed above is analogous to former section 675's condition of "satisfied in fact." Section 18 of the Uniform Act defines a "qualified insurer" along financially secure lines; the comment to section 18 notes that "[t]he schedule of payments in a periodic payment judgment may extend as far as 70 or 80 years into the future [as is the case here]. Claimants are entitled to the assurance that insurers participating in the funding of such long-term obligations are of exceptional financial strength." (14 West's U.Laws Ann., *supra,* Uniform Act, § 18, com., p. 37).) And another commentator in this area has stated: " 'The [Uniform Act] is, without question, more sophisticated than any periodic payment statute currently in existence. In particular,

---

[2]Section 724.010, subdivision (a), reads: "A money judgment may be satisfied by payment of the full amount required to satisfy the judgment or by acceptance by the judgment creditor of a lesser sum in full satisfaction of the judgment."

the attention paid to ensuring that funding mechanisms for periodic payment judgments are financially secure . . . put[s] the Act in a league by itself.' " (Hindert et al., Structured Settlements and Periodic payment Judgments (1992) § 9.03, p. 9-29, as quoted in Horvitz & Levy, MICRA Manual, *supra*, at p. 112.)

Finally, as a last measure of security, there is precedent in California for setting aside a satisfaction of judgment if the consideration for the satisfaction fails. (See *Argue* v. *Wilson* (1935) 3 Cal.App.2d 645 [40 P.2d 297] [satisfaction of judgment vacated where the insurance company that had prepared the check for the judgment amount in exchange for the satisfaction was taken over by a receiver before the check was honored]; see also *Kinnison* v. *Guaranty Liquidating Corp.* (1941) 18 Cal.2d 256, 265 [115 P.2d 450]; *Kachig* v. *Boothe* (1971) 22 Cal.App.3d 626, 632 [99 Cal.Rptr. 393]; *Remillard Brick Co.* v. *Dandini* (1950) 98 Cal.App.2d 617, 622 [220 P.2d 927].) From *Argue* it can be argued that the section 667.7 judgment creditor is not left unprotected even in the unlikely event that annuity payments stop due to insolvency (an extremely unlikely event where one "qualified insurer's" performance is being guaranteed by another).

I think a satisfaction of judgment could be entered in a case like this one if the requirements set forth above were met. But my conclusion incorporates standards that should be enacted by the Legislature and not by the judiciary.

A petition for a rehearing was denied October 25, 1995, and appellant's petition for review by the Supreme Court was denied January 24, 1996.